# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CR-22-91-F |
| | ) | |
| JOHNNY ALLEN SAPCUT, | ) | |
| a/k/a Johnny Sapcut, | ) | |
| | ) | |
| Defendant. | | |

## MEMORANDUM AND ORDER

### I.  Introduction

In a one-count indictment, the defendant, Johnny Allen Sapcut, is charged, under 18 U.S.C. §§ 1111(a) and 1153, with second degree murder in Indian Country. He is alleged to have killed the victim by stabbing her with a knife on or about February 14, 2022.  He is presumed to be innocent.

Mr. Sapcut, nineteen years old, has been diagnosed with acute schizophrenia, a psychotic disorder characterized by delusions, hallucinations, disorganized speech or behavior, and diminished emotional expression.  His mental illness impairs his ability to understand the nature and potential consequences of the charges against him and to assist meaningfully in his defense.  In short, Mr. Sapcut is, at present, incompetent to stand trial.  (Insanity is not asserted as a defense to the murder charge.)

Examiners at the Federal Medical Center at Butner, North Carolina (FMC Butner or Butner), have concluded that it is "substantially likely" that, with administration of antipsychotic medication, Mr. Sapcut can be restored to trial

competence.  Doc. no. 55, at 4.  It is probable that antipsychotic medication, if administered at all, will–at least initially–have to be administered involuntarily. Consequently, the government has filed a motion seeking, in the framework provided by Sell v. United States, 539 U.S. 166 (2003) and its progeny, court authorization to proceed with involuntary administration of the medication the clinicians at Butner (a psychologist and a psychiatrist) believe will likely render Mr. Sapcut competent to stand trial.  The court held an evidentiary hearing on the motion on November 13, 2023.  The court concludes, for the reasons set forth in this order, that the government has carried its heavy burden of establishing that the prerequisites established by Sell and its progeny have been satisfied.

II. Legal Framework for Adjudication under *Sell*

"[A]n individual has a constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs—an interest that only an essential or overriding state interest might overcome."  Sell, 539 U.S. 166, 178-79 (2003) (internal quotation marks and citation omitted).

In Sell, the Supreme Court identified four prerequisites to entry of an order for involuntary medication for the purpose of rendering a defendant competent to stand trial.

"First, a court must find that *important* governmental interests are at stake." *Id*. at 180 (emphasis in original).  Bringing a defendant charged with a serious crime to trial is an important government interest, but the importance of that interest may be lessened by specific circumstances, such as the amount of time the defendant has already spent in confinement (which would be credited toward any sentence imposed) or the possibility of civil commitment absent a criminal trial.  *Id*.

"Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests."  *Id*. at 181 (emphasis in original).  On this issue, the court "must find that administration of the drugs is

2

substantially likely to render the defendant competent to stand trial" and "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." *Id*.  For this purpose, not all side effects are created equal.  For instance, weight gain (the possibility of which is discussed later) would probably not be what the <u>Sell</u> court called a "trial-related side effect[]." *Id*. at 185.  A "trial-related side effect" might result from use of a medication that would "tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions." *Id*. (citing <u>Riggins v. Nevada</u>, 504 U.S. 127, 142-145 (1992) (Kennedy, J., concurring in the judgment)).

"Third, the court must conclude that involuntary medication is *necessary* to further those interests." *Id*. at 181 (emphasis in original).  "The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id*. at 181.

And "[f]ourth, . . . the court must conclude that administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition." *Id*. at 181 (emphasis in original).

The first and second <u>Sell</u> prerequisites present primarily legal questions. <u>United States v. Chavez</u>, 734 F.3d 1247, 1250 (10th Cir. 2013).  The third and fourth requirements are factual questions. *Id*.  Given "the vital constitutional liberty interest at stake," in avoiding involuntary medication, the court, in undertaking a <u>Sell</u> inquiry, must find all necessary underlying facts by "clear and convincing evidence." <u>United States v. Bradley</u>, 417 F.3d 1107, 1114 (10th Cir. 2005).  "[T]he government establishes a fact by clear and convincing evidence only if the evidence places in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable." <u>United States v. Valenzuela-Puentes</u>, 479 F.3d 1220, 1228 (10th Cir. 2007) (alteration and internal quotation marks omitted).

Involuntary medication "based *solely* on the need to render an incompetent defendant competent to stand trial should be 'rare' and occur only in 'limited circumstances.'" Valenzuela-Puentes, 479 F.3d at 1224 (quoting Sell, 539 U.S. at 169) (emphasis in original). "One means of rendering a Sell order 'rare' is to first conduct [an inquiry under Washington v. Harper, 494 U.S. 210 (1990)] to determine whether the defendant may be involuntarily medicated because he presents a danger to himself or others." Valenzuela-Puentes, 479 F.3d at 1224. If the court "may order involuntary medication based on the Harper inquiry, then there is no need to consider a Sell order." *Id*. Thus, the court, "when appropriate," should first "consider the applicability of Harper before turning to Sell." *Id.*

In this case, there is no contention or evidence that defendant is, at present, a danger to himself or others. Because dangerousness is not an issue, the Harper framework for consideration of involuntary medication (less complex and generally less demanding than Sell) does not apply here. *See*, Valenzuela-Puentes, 479 F.3d at 1224; *see also*, Chavez, 734 F.3d at 1249 n. 1. Consequently, the parties and the court have addressed the issues now before the court in the Sell framework.

Lastly, "[w]hile Sell does not explicitly identify what level of specificity is required in a court's order for involuntary medication . . . the need for a high level of detail is plainly contemplated by the comprehensive findings Sell requires." Chavez, 734 F.3d at 1252. The court's order to involuntarily medicate a non-dangerous defendant solely in order to render him competent to stand trial must specify which medications might be administered and their maximum dosages. *Id*. at 1253.

If the Sell prerequisites are satisfied and court finds that there is "a substantial probability" that, with treatment, the defendant will "attain the capacity to permit the proceedings to go forward," treatment may be ordered for a "reasonable period of time." 18 U.S.C. § 4241(d)(2).

Restoration of competency at Butner would result in the issuance of a certificate of competency by FMC Butner.  *See*, 18 U.S.C. § 4241(e).  That would trigger a requirement for a competency hearing in this court.  If the court is satisfied "by a preponderance of the evidence that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, the court shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial or other proceedings." *Id.*  The prospect of a transfer out of the Butner environment, with the complement of resources available there, raises the question of what happens if there is a problem with medication compliance after a defendant returns to the originating jurisdiction for trial.  The possibility of a need for post-discharge involuntary medication is not addressed by the government's motion and will not be addressed at any great length in this memorandum.  That is a matter for another day.  It is worth noting, however, that this court, if called upon to address the possibility of post-discharge involuntary medication, would not be writing on a clean slate.  If the government were to propose "to forcibly medicate [Mr. Sapcut] *during trial*," due process would require the court to make findings as to the need for and medical appropriateness of medication during trial.  United States v. Keevan, 115 F.Supp. 2d 1132, 1141 (E.D. Mo. 2000) (emphasis in original) (citing United States v. Morgan 193 F.3d 252, 264 (4th Cir. 1999)).  And in that event, it would be necessary to "ensure that the medication posed no significant risk of altering or impairing [Mr. Sapcut's] demeanor in a manner that would prejudice his capacity or willingness to either react to testimony at trial or to assist his counsel." Morgan, 193 F.3d at 264 (citing Riggins, 504 U.S. at 135 (Kennedy, J., concurring in the judgment)). *See also*, as to forced medication during trial, Papantony v. Hedrick, 215 F.3d 863, 865 (8th Cir. 2000), and as to appropriate procedural protections, In re Taylor, 241 A.3d

287, 304 (App. D.C. 2020).  And another possibility, discussed at the <u>Sell</u> hearing, would be a return to Butner for further treatment.

III.   Findings of Fact

A.  <u>Mr. Sapcut's mental illness</u>.

Mr. Sapcut was assessed by Butner staff upon arrival at that institution in July, 2023.  "When asked how he was doing, he kept his head facing down and mumbled something unintelligible.  When asked what he said he responded, 'OK.'  Mr. Sapcut offered one word answers to most questions presented to him and that word was often, 'No.'  When asked if he knew why he was at the FMC, he responded, 'To do time.'"  Doc. no. 52, at 5.

While at Butner,

> Mr. Sapcut's presentation was generally unchanging.  His grooming and hygiene were poorly maintained.  He did not appear to take a shower or wash himself.  He did not request a toothbrush or toothpaste. Additionally, his cell was often dirty with old food trays and small pieces of food.  There were often ants in his cell due to his poor sanitation.  However, Mr. Sapcut was also uncooperative when asked to return his food trays or allow orderlies to clean his cell.  He frequently ignored staff at his door.  Mr. Sapcut did not make eye contact when he would get up.  Even when directly told to look at staff, he did not comply and stared at the wall.  He appeared to be oriented to his person as he would periodically respond when staff stated his name, but gave no indication that he understood where he was or why he was at the FMC.

*Id.* at 6.

Mr. Sapcut was persistently unresponsive at Butner, and "did not respond to staff attempts to get his attention."  *Id*.  When conversation was attempted, he "remained fixated on his hallucinations." *Id*.  His hallucinations–"a false sensory perception that has a compelling sense of reality despite the absence of an external stimulus (*id.* at 8)–manifested when "he was observed muttering and speaking to himself and at times appeared to be arguing with another individual who was not

6

present. He was unresponsive to redirection from staff at those times." *Id.*  At times, Mr. Sapcut "believed others possessed the ability to hear his thoughts."  *Id.*

At one point, Mr. Sapcut skipped nine meals in a row and didn't communicate with staff as to the reasons he was refusing meals or why he resumed eating.  (The government does not suggest that Mr. Sapcut was malingering, and neither the examination reports nor the examiners' testimony suggest malingering.)

The short of the matter is that Mr. Sapcut's schizophrenia, unless successfully treated, confines him permanently in a world apart from that inhabited by any other person with whom he might come in contact.  Dr. Kristina Lloyd, a board-certified forensic psychologist at Butner, testified, credibly, that "Mr. Sapcut is so ill that he isn't able to engage in any kind of conversation, interaction with anybody."  T. 25.[1] Without medication, he "will be nonrestorable."  T. 26.  At Butner, he lives "in a cell by himself."  T. 38.

B.  Treatment:  method, efficacy, side effects, and continuing compliance.

i.  Method.[2]

At the hearing, the proposed treatment of Mr. Sapcut was addressed by Dr. Lloyd and by Charles A. Cloutier, M.D., a board-certified staff psychiatrist at Butner.

At the outset of treatment, the actual course of treatment will be determined in part by whether Mr. Sapcut refuses antipsychotic medication.  Defendants, when informed that medication has been ordered by the court, will usually voluntarily

---

[1] "T" references are to the transcript of the November 13, 2023 Sell hearing.  Doc. no. 61, filed on November 25, 2023.

[2] The court's findings as to the proposed method of treatment are based on the testimony at the hearing and on the Forensic Evaluation Addendum (including a Proposed Individualized Treatment Plan and the "FMC Butner *Sell* Appendix 2021") prepared by the staff at Butner.  *See,* doc. no. 55, at 3-4; doc. no. 55-1.  Dr. Charles A. Cloutier, a board-certified psychiatrist at Butner, signed the written plan and (without objection) expressly adopted the Forensic Evaluation Addendum and the *Sell* Appendix as part of his testimony.  T. 54.

comply with the order.  T. 27-28 (Lloyd).  Their thinking is that "I don't want to do this, but I understand I have to with the court order, and so then they are compliant." T. 28 (Lloyd).  Consequently, "It is  rare that we are required to have a use-of-force team and force the individual to take medication." *Id.*  And if it turns out that forcible medication is required, "typically a use-of-force team is only required once." *Id*. at 30.  That said, it is also true that, in Dr. Cloutier's view, Mr. Sapcut's psychosis is so severe that it is likely that forced medication will be necessary, at least initially. Doc. no. 55, at 3; T. 57, 69 (Cloutier).  For purposes of this order, the court takes it as a given that, at least at the outset, forcible administration will be necessary.

To accomplish forced medication, "[O]ur mental health lieutenant would assemble a team of five correctional staff who would enter Mr. Sapcut's cell and remove him from his cell, place him in a chair, and he would then be restrained and injected with the medication."  T. 29 (Lloyd).

In the likely event that forced medication is necessary, the preferred injectable medication is haloperidol.  Doc. no. 55, at 3; T. 56 (Cloutier).  The reason is that:

> [W]e want to use a medicine that is well known, that we work with, and is also available in an injectable formulation, in both a short-acting and a long-acting formulation, so that if he does refuse an oral medication and we use haloperidol by injection, we would use the short-acting form at low dose to ensure that he tolerates it without any allergic reaction. And if it is tolerated in that respect, then we would administer a long-acting injection or formulation of haloperidol, which would last anywhere from two to four weeks.

T. 56 (Cloutier).

Haloperidol also has the benefit of relatively rapid absorption, resulting in peak drug levels within a few days.  Doc. no. 55-1, at 6.  If, after initial treatment with haloperidol, Mr. Sapcut chooses to comply with the order for medication, injection will not be necessary.  At that point, the preferred oral medication would be aripiprazole (Abilify) or risperidone (Risperdal).   Undesirable side effects

(discussed below) could intervene after treatment with haloperidol begins.  If there is a lack of efficacy or a "lack of tolerability" with haloperidol, "we would switch medications."  T. 67 (Cloutier).  For that reason, the treating psychiatrist needs "at least some latitude" to make medically necessary changes in the regimen.  T. 66 (Cloutier).

As for haloperidol as the injectable drug used at the outset,  treatment should start with 3 milligram injections of a "quick-acting" formulation.  T. 61 (Cloutier). With haloperidol or any other antipsychotic drug, the standard clinical approach "is to use the lowest dose that is effective."  T. 56-57 (Cloutier).[3]  After initial injection of the quick-acting formulation, treatment would transition to a long-acting haloperidol formulation, with injection every two to four weeks of 50 milligrams at the low end and 400 milligrams at the high end.  T. 61 (Cloutier).  The most common haloperidol dosage is 100 to 200 milligrams per month.  *Id.*  The preferred interval for injections is four weeks, but, depending on the clinical response, the interval can be shortened to two or three weeks.  T. 74 (Cloutier).  Approximately every two to four weeks, the treatment team assesses efficacy.  T. 75 (Cloutier).

If, as the clinicians hope, Mr. Sapcut opts for voluntary compliance after the initial injections, treatment can transition to an oral medication "that we tend to use for first-onset schizophrenia."  T. 57 (Cloutier).  That would be Abilify, taken orally

---

[3] The testimony of Dr. Cloutier and Dr. Lloyd was uncontradicted. Nevertheless, the court has carefully evaluated all of the testimony of these two witnesses rather than taking it as true for lack of opposing testimony. To the extent that the findings in this section of this memorandum recount their testimony about their general approach to treating schizophrenia, those findings should also be taken as being specifically applicable to the proposed treatment of Mr. Sapcut.  (And this is as good a place as any to note that the court was very favorably impressed with the expertise, candor and professionalism of Drs. Cloutier and Lloyd.)

at a 2.5 milligram daily dosage to start, with dosage increasing to 20 milligrams[4] a day if necessary, based on clinical response.  T. 58-59 (Cloutier).  If voluntary compliance (*e.g.*, taking the drug orally every day) wanes,  or if Mr. Sapcut expresses a preference for injection, an injectable form of Abilify can be administered on a monthly basis, at a dosage (every four to eight weeks) of 441 milligrams at the low end, with a maximum of 1,035 milligrams.  T. 60 (Cloutier).

As is discussed below, the possibility of undesirable side effects with haloperidol or Abilify cannot be excluded.  If those side effects cannot be managed with dose reduction or adjunctive medication (medication intended specifically to counteract side effects),  Risperdal will be the next choice, although it is not available in an injectable or quick-acting formulation.  T. 65 (Cloutier).  At such time as antipsychotic treatment of Mr. Sapcut may get to the point that experience demonstrates that administration of haloperidol and Abilify should be discontinued, the clinicians would hope that Mr. Sapcut would be amenable to oral administration of Risperdal.  Treatment with Risperdal would start at 2 milligrams daily, with a maximum of 12 milligrams (oral formulation).  T. 70 (Cloutier).  One advantage of treatment with Risperdal is that it has a long tail–a patient who has been treated with Risperdal for three consecutive injection cycles at two-week intervals will have peak drug levels in his serum for six consecutive weeks after the last injection.  Doc. no. 55-1, at 7.

If necessary for the purpose of mitigating agitation or combative behavior when medications are injected, Mr. Sapcut may receive an injection of lorazepam 2 milligrams to assist with calming him down so he can be safely released from

---

[4] Although Dr. Cloutier testified that "it is possible to go up to 30 milligrams," he described 20 milligrams as "a high dose, sort of the upper limit."  Because he did not, in terms, say that 30 milligrams, though "possible," would be medically appropriate, the court adheres to his 20 milligram "upper limit."  T. 59.

restraints in a shorter period of time.  Doc. no. 55-1, at 10.  A 1 milligram injection of benztropine may also be given in conjunction with an injection of short-acting haloperidol to prevent drug-induced involuntary movements and related symptoms. *Id.*  If Mr. Sapcut experiences neuromuscular side effects from treatment with any of the antipsychotic medications, he will be offered the lowest effective dose of adjunctive medication to manage those adverse effects. This may include (i) benztropine at doses ranging from 0.5 to 2 milligrams two or three times daily as needed if he begins to manifest muscle stiffness or tremor, and (ii) propranolol at doses ranging from 10 milligrams to 40 milligrams two to three times daily as needed for restlessness. If clinically indicated, adjunctive medication may also include short courses of lorazepam at doses ranging from 0.5 milligrams to 1 milligram two or three times daily as needed for short-term treatment of neuromuscular side effects that do not respond to other adjunctive treatments.  Doc. no. 55-1, at 9.  Benadryl or Cogentin may also be administered as adjunctive medications.  T. 70, 76 (Cloutier).

Importantly, Dr. Cloutier would recommend the course of antipsychotic treatment described here in a normal clinical setting, irrespective of any need to restore competency to stand trial.  T. 71.  Dr. Lloyd agrees.  T. 28.

    ii.  <u>Efficacy</u>.

Treatment of Mr. Sapcut with antipsychotic medications will require four to eight months.  T. 33 (Lloyd), 79 (Cloutier); Doc. no. 55, at 4.  (Psychotherapy will not work:  "Mr. Sapcut is so ill that he isn't able to engage in any kind of conversation, interaction with anybody.  And so talking with him -- we've been talking with him since July.  That has accomplished nothing.  And until his illness is medically treated, I don't expect that there will be any change just through talking to him alone."  T. 25 (Lloyd).  Talk therapy would be equivalent to saying, "let's just talk about your diabetes and see if that lowers your blood sugar."  Id.)

The expected benefit of treatment of Mr. Sapcut with antipsychotic medications will be "primarily a reduction in symptoms, so not having the hallucinations or delusions and to be able to be more engaged in his self-care.  So his personal functioning should improve and his ability to engage with treatment providers."  T. 71 (Cloutier).  He will be able to assist his counsel in his defense.  T. 55 (Cloutier).  Or, as Dr. Lloyd put it:

> My expected outcome is that Mr. Sapcut's symptoms will go into remission.  And what I mean by that is that he will not have delusions.  He will not experience hallucinations.  He will be able to engage in speech and care for himself.  He will eat meals on a regular basis.  He will not spend all day lying under the blankets.  He will talk with staff.  It's my expectation that his symptoms will improve enough that he will be able to leave our secure mental health unit and reside in general population with a cellmate.

T. 33 (Lloyd).

Dr. Cloutier testified that use of medications to treat a schizophrenic patient is "very likely" to restore competency.  T. 55.  This is borne out by experience at Butner.  Based on research conducted at Butner, "individuals who are diagnosed with schizophrenia were restored to competency at a rate of about 76 percent."  T. 23 (Lloyd).  It comes as no surprise, then, that Dr. Lloyd believes that it is "substantially likely that Mr. Sapcut could be restored."  *Id.*  The court's confidence in these two clinicians' estimates of the likelihood of successful treatment of Mr. Sapcut's schizophrenia is, to put it mildly, bolstered by the fact that their estimates are based on actual experience–and research–involving federal inmates and detainees at Butner.[5]

---

[5] There are, of course, no guarantees.  For that reason, as will be seen, the court will require periodic reports as to Mr. Sapcut's progress.  Six months is a reasonable interval.  T. 46-47 (Lloyd).

iii. <u>Side effects</u>.

Side effects which may be encountered as a result of treatment with antipsychotic medication include weight gain, emergence or worsening of diabetes, and high cholesterol.  Doc. no. 55-1, at 5.  More serious–but rare–potential side effects include neuroleptic malignant syndrome (possibly resulting in muscular rigidity), dystonia,[6] high fever, increased blood pressure, increased heart rate, akinesia,[7] mutism,[8] obtundation,[9] and cardiac arrhythmia.  *Id.* at 6.  The risk of sudden death due to cardiac arrhythmia "in the general adult population is approximately seven to 14 events per 10,000 person-years, compared to 10 to 29 events per 10,000 person-years in populations treated with antipsychotic medication."  *Id.*  Cardiac arrhythmia "typically involves someone who has some type of cardiac comorbidity."  T. 64 (Cloutier).  Mr. Sapcut has no known cardiac comorbidity.  *Id.*

The first line of defense against side effects is to use the lowest efficacious dose of the antipsychotic medication.  T. 63 (Cloutier).  Failing that, the clinicians have to decide whether to switch to other medications (as has been discussed) or to use adjunctive medications.  T. 65, 75 (Cloutier).  For instance, neuromuscular side effects are treatable with Benadryl.  T. 63 (Cloutier).

Assessing possible side effects in terms of the magnitude of the risk, potential severity, and efficacy of countermeasures, the court is satisfied that the potential benefit of treatment of Mr. Sapcut with antipsychotic medications far outweighs concerns with respect to side effects.

---

[6] Involuntary muscle contractions.

[7] Impairment of voluntary movement.

[8] Inability to speak.

[9] Decreased alertness; decreased responsiveness to stimuli.

iv.  <u>Continuing compliance</u>.

It is obvious to the court that, to the extent that any aspect of this whole exercise can be called optimal, the environment for treatment at Butner is optimal, in terms of conditions conducive to medication compliance (with resultant therapeutic success).  But successful treatment at Butner will be a vain exercise– from the perspectives of both the government and the defendant–if Mr. Sapcut fails to comply, after discharge from Butner, with a regimen of antipsychotic medication. The court addressed that concern at the <u>Sell</u> hearing:

> THE COURT:   Okay.   So now, once again, we're speaking hypothetically but obviously based on what you would clinically expect.  Once he's restored -- in other words, once he joins what you have said is about 76 percent of all individuals who receive this treatment for this purpose -- once he's restored and is remaining on medication on a maintenance basis, what is the effect of that on his decision-making ability with respect to whether to continue on medication? In other words, I'm comparing his decision-making ability in the grip of schizophrenia versus his decision-making ability once he has been restored and is receiving medication on a maintenance basis. How would you expect his decision-making process to play out once he's restored with respect to whether to continue on medication voluntarily?

> [DR. LLOYD]:  Typically, defendants are able to appreciate that if the court has ordered them to take medication, that if they decide to stop taking that, the repercussion is that they will then be sent back to FMC Butner for restoration again and that this process can continue over and over and over.  So oftentimes even in individuals who may think, I don't really think I have a mental health problem, I don't think I really need to take this medication, but I now understand that the court is serious that I must take this medication and if I don't, I will continue to go back to FMC Butner -- and typically, before defendants leave, I talk with them about that that very much is the process; that if you leave and you stop your medication, then you probably will come back here.  And I have had one person in particular return here four times.  He was not involuntarily medicated.   He was a voluntary patient, but he kept stopping his medication.   And so in order to get through the entire

process, it took him four admissions to Butner. And so typically, we will talk with defendants that if you don't, you will come back here.

They oftentimes have been here and been in this process long enough that they want to get their legal situation resolved and can appreciate that this is the way to get that resolved. And if they want to stop taking their medication after their legal situation is resolved, however that might turn out, that that's a choice that they can then make in the future but that the court has ordered -- and typically court orders indicate for the duration of their legal proceedings -- that they must take the medication. And so that makes it a little bit easier after the inmate is in remission and when they're on that sort of maintenance dose.

THE COURT: And is it typical, then, in those cases where -- with patients with this sort of a diagnosis, is it typical that there must be ongoing maintenance administration of the medication which has initially, at least, proven to be effective in achieving remission of symptoms? Is it typical that that medication must continue?

[DR. LLOYD]: Yes.

THE COURT: And in those cases, then, where the medication must continue, is -- again, is it typical that once they are sent back to the jurisdiction from which they came, is it typical that voluntary compliance is achieved once they're back in the originating jurisdiction?

[DR. LLOYD]: Yes.

THE COURT: This is probably a little bit off the subject, but I just can't help but ask. Your answer seems quite understandable to me, but I take it you rely on having that stick of possible return to Butner as opposed to the inmate simply realizing, hey, now I have been restored to some semblance of normality; I want to continue to be normal; I'm going to keep on taking this medication. I take it that is not always sufficient to achieve voluntary medication compliance.

[DR. LLOYD]: In this particular disorder, one of the most common symptoms that we see is very poor insight into one's illness, and so that makes it particularly tricky. If you can't have insight into appreciating that you were so unwell, then it's very difficult to realize and appreciate that you need to keep taking the medication. Because the disorder alone prevents you from appreciating that there's anything wrong at all. And so it's sort of a little bit of a Catch-22.

15

> There are some individuals that can say, yes, I remember seeing these things, they were factually not true and I was not doing well, and so I know I need to take my medication. But there are also a portion of individuals with psychosis that are not able to achieve insight. And that very lack of insight prevents them from appreciating how much they need their medication. And so it's a little bit of a conundrum in those cases.

T. 40-43.

The relevant statute, 18 U.S.C. § 4241, does not expressly authorize the court to order a defendant to comply with a medication regimen after he has been restored, a certificate of competency has been issued, and a final competency hearing has been held. *See,* 18 U.S.C. § 4241(e). The likely consequence of a failure to comply is, as described above by Dr. Lloyd, another round of treatment at Butner. The court, by this order, authorizes FMC Butner to involuntarily medicate Mr. Sapcut. If that course of treatment should result in remission of Mr. Sapcut's symptoms and a restoration of competence, the court will expect defense counsel to make plain to Mr. Sapcut (i) the importance of continuing medication compliance, and (ii) the possible consequences, as discussed in part II, above, of any failure, post discharge, to comply with an antipsychotic medication regimen.

C.  Summary of findings.

On the basis of the evidence before the court and the specific findings set forth above, the court finds, by clear and convincing evidence, that:

Important governmental interests are at stake with respect to the question of whether this case should proceed to a final adjudication of the charge of second degree murder in Indian Country. Defendant does not contest this. Doc. no. 57, at 2.

Involuntary medication of Mr. Sapcut will significantly further the important governmental interests that are at stake. Administration of the medications identified by the Butner clinicians is substantially likely to render Mr. Sapcut competent to

stand trial.  And absent medication, it is unlikely that the United States would ever be in a position to proceed to trial in this case.  Administration of those medications is substantially unlikely to produce side effects that would interfere significantly with Mr. Sapcut's ability to assist counsel in defending him at trial.

Among the available alternative possibilities, the less intrusive ones (*e.g.*, no medication, talk therapy, medication only if completely voluntary) are unlikely to bring about  remission of Mr. Sapcut's schizophrenia.  Remission of Mr. Sapcut's schizophrenia is necessary to render him competent to stand trial and assist in his defense.   Involuntary medication is consequently necessary to further the government's interest in bringing Mr. Sapcut to trial on the charges in the indictment.

Administration of the medications proposed by the Butner clinicians, by the means and in the dosages they have proposed, as described in this memorandum, is medically appropriate, *i.e.*, in the best medical interest of Mr. Sapcut in light of his medical condition.  This is a stand-alone factor which the court evaluates from the singular perspective of Johnny Allen Sapcut, as if he had no charges pending and he found himself in need of medical advice as to the most efficacious means of escaping from the unrelenting grip of the schizophrenia which deprives him of meaningful existence as a human being.  We don't know for sure whether the proposed treatment will work, but one thing we do know to a virtual certainty is that, absent successful medication, there will be no escape.

## IV.   Conclusion

The very idea, in this or virtually any other context, of bringing the power of the state to bear to medicate a person against his will conjures up sobering thoughts about some fundamental precepts of human freedom.  That much was plainly recognized by the Court in <u>Sell</u>.  That said, it is also true that, in this case, the "will" against which the medication would be administered is the will of a man who is,

absent effective treatment, imprisoned for life in the confines of his own schizophrenic mind, a form of imprisonment which strikes the undersigned as being at least as cruel as most any kind of physical incarceration.  For this reason, and because the government has otherwise satisfied the demanding standard established by the Court in <u>Sell</u>, the government's motion will be granted.

V.  <u>Order</u>

The government's motion to involuntarily medicate the defendant, Johnny Allen Sapcut, doc. no. 56, is **GRANTED** as and to the extent set forth below.  It is accordingly **ORDERED** that:

1.   The government may medicate the defendant, Johnny Allen Sapcut, voluntarily or involuntarily, using the medications and maximum dosages set forth in part III(B)(i), above.

2.   Treatment may not, absent authorization by further order of this court, continue longer than 240 days from the earlier of (i) December 14, 2023 or (ii) the date of first treatment rendered pursuant to this order.

3.   Notwithstanding the findings in part III(B)(i) of this order with respect to dosage ranges, any of the medications approved in this order may, for the purpose of ascertaining drug tolerance and side effects, or for any other medically appropriate purpose, be administered in doses lower than the indicated low end dose.

4.   The appropriate authority at FMC Butner shall render an interim report to the court not later than 180 days after the first treatment rendered pursuant to this order.  The report shall include, at a minimum:  (i) a description of the course of treatment rendered pursuant to this order (including a listing, by name, of the medications administered), (ii) a description of the extent to which Mr. Sapcut has voluntarily taken antipsychotic or adjunctive medications, (iii) a description of the extent to which the symptoms of schizophrenia have decreased or increased, (iv) a description of any side effects encountered, the measures, if any, taken to counter those side

effects, and the efficacy of any such measures (v) an evaluation of the overall efficacy of antipsychotic treatment to date, and (vi) an evaluation of the prospects for restoration of competency within the authorized treatment period specified in paragraph 2, above.

5.   The appropriate authority at FMC Butner shall render an interim report to the court if Mr. Sapcut's response to treatment, or other events, indicate that treatment should be discontinued.

6.   If clinicians at FMC Butner conclude that treatment (in terms of medications used, dosage, or other matters) outside of the parameters established in this order is advisable and medically appropriate in support of their efforts to treat Mr. Sapcut's schizophrenia, they are authorized to make such a recommendation by written report to the court.  In that event, rather than requiring–at least as an initial matter–a formal motion to modify this order (with the delay that would entail), the court will promptly confer with counsel informally in chambers with a view to determining whether it shall be necessary for the court to address the recommendation on a contested basis.

7.   At such time as the appropriate authority at FMC Butner shall issue a certificate of competency, clinicians at FMC Butner shall advise the court and counsel as to the recommended continuing regimen of medications they consider to be medically appropriate for Mr. Sapcut.

8.   Any reports rendered as required or permitted by this order shall be sent to the Courtroom Deputy assigned to the undersigned judge and to counsel of record in this case.

9.   Within three working days after entry of an order for discharge from FMC Butner under 18 U.S.C. § 4241(e), the government shall file an advisement to the court, under seal, advising the court and counsel for defendant as to the following matters:  (i) the name of the facility to which the defendant will be transferred from

FMC Butner to await trial, (ii) the name and prescribed dosage of medications prescribed for defendant upon discharge from FMC Butner,[10] (iii) whether arrangements have been made for continuing administration of prescribed medications while Mr. Sapcut is in transit and at the receiving facility, (iv) the job titles *and* names of the individuals at the receiving facility who will be personally responsible for causing the prescribed medications to be provided to the defendant, and (v) the names of the Deputy United States Marshals in the office of the U.S. Marshal for the Western District of Oklahoma who are personally responsible for ensuring that the medications prescribed for Mr. Sapcut are administered as prescribed.

DATED this 6th day of December, 2023.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

22-0091p015.docx

---

[10] The court recognizes that, at such time as an order for discharge may be entered, clinicians at FMC Butner will have advised the court and counsel as to the recommended continuing regimen of medications. *See*, ¶ 7, above.  The court's intent here is to minimize the potential for confusion, miscommunication or delay with respect to the medications to be administered once Mr. Sapcut has been transferred to a local facility to await trial.